IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2023

**STATE OF TENNESSEE v. DUANE R. DOXTATER**

**Appeal from the Criminal Court for Sullivan County**
**Nos. S67,821; S68,009-011; S73,301-303; S73,562     James F. Goodwin, Jr., Judge**

———————————————

**No. E2023-00261-CCA-R3-CD**

———————————————

The Defendant, Duane R. Doxtater, appeals the trial court's revocation of his effective ten-year probationary sentence for multiple convictions stemming from two separate global guilty plea agreements. On appeal, he argues that the trial court erred by fully revoking his probation and ordering him to serve the remainder of his sentence in confinement. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Brennan M. Wingerter, Assistant Public Defender – Appellate Director, Tennessee District Public Defenders Conference (on appeal), Franklin, Tennessee; and Andrew J. Gibbons, District Public Defender, Wesley A. Mink, Assistant District Public Defender, and George Todd East (at revocation hearing), Kingsport, Tennessee, for the appellant, Duane R. Doxtater.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Barry P. Staubus, District Attorney General; and P. Michael Filetti, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.     FACTUAL AND PROCEDURAL HISTORY**

The Defendant's effective ten-year sentence in this probation revocation case stems from his multiple convictions in eight cases. The record, which includes uniform judgment

documents and guilty plea paperwork, reflects that the Defendant entered two global guilty pleas—the first on February 2, 2018, and the second on April 8, 2021.

## A.  February 2, 2018 Guilty Plea

On April 25, 2017, in case number S67,821, the Sullivan County grand jury returned an indictment against the Defendant, charging him with three counts of statutory rape. *See* Tenn. Code Ann. § 39-13-506. On May 9, 2017, in case numbers S68,009 through S68,011, the Sullivan County grand jury returned two indictments and one presentment against the Defendant, charging him with the following offenses: theft of property valued at $2,500 or more but less than $10,000; vandalism of property valued at more than $1,000 but less than $2,500; evading arrest while operating a motor vehicle; evading arrest; speeding; running a red light; operating a vehicle with no valid driver's license; and escape. *See* Tenn. Code Ann. §§ 39-14-103, -14-408, -16-603, -16-605; 55-8-104, -8-149, -8-152, 50-301. Thereafter, on February 2, 2018, the Defendant entered a global guilty plea agreement resolving all four cases—two counts of statutory rape were dismissed, and he otherwise pleaded guilty as charged to all counts. Per the terms of the agreement, the Defendant received an effective six-year sentence to be served at thirty percent as a Range I, standard offender for these convictions, and he would "apply" for probation.[1] The judgment forms reflect that on February 9, 2018, the Defendant's remaining sentence was suspended and that he was given credit for time served.[2]

## B.  April 8, 2021 Guilty Plea

Before the expiration of the Defendant's six-year sentence, the Sullivan County grand jury returned a presentment against the Defendant on September 23, 2020, charging him in case number S73,562 with aggravated domestic assault, domestic assault, domestic vandalism of property valued at $1,000 or less, and two counts of assault. *See* Tenn. Code Ann. §§ 39-13-101, -13-102, -13-111, -14-408. On October 7, 2020, the Sullivan County grand jury, in case numbers S73,301 through S73,303, returned three presentments against the Defendant, charging him with the following offenses: three counts of failure to provide proof of financial responsibility, two counts of driving on a suspended license, one count of driving on a revoked license, one count of unlawful removal of a registration decal or plate, one count of failing to display a certificate of vehicle registration upon demand, and one count of violating the bumper law. *See* Tenn. Code Ann. §§ 55-4-108, -4-129, -9-

---

[1] The plea agreement noted that the escape conviction required mandatory service of sixty days.

[2] We note that the judgment forms indicate that the Defendant was originally placed in the Community Corrections Program relative to this six-year sentence.

215, -12-139, -50-504.  On April 8, 2021, the Defendant entered a global guilty plea agreement resolving all four cases—he pleaded guilty to all counts as charged, with the agreement that the conviction for domestic assault would merge with the aggravated domestic assault conviction.  Per the terms of the agreement, he received an effective four-year sentence to be served at thirty percent as a Range I, standard offender, which was to be suspended to supervised probation.  This four-year sentence was to be served consecutively to the remainder of the Defendant's effective six-year sentence in cases S67,821 and S68,099 through S68,011.  The judgment forms reflect that the Defendant was given credit for time served and that as a condition of his probation, he was not to possess or use alcohol or illegal drugs.

### C.     Probation Revocation Proceedings

On July 1, 2022, the Defendant's probation officer, Carlos Payne, filed a probation violation affidavit, seeking a warrant for the Defendant's arrest.  The affidavit listed all eight case numbers and stated that the Defendant received a total effective sentence of ten years and was granted probation on June 10, 2019.  The warrant alleged that the Defendant violated the rules on his probation on or about June 25, 2022, based upon the following behavior: "The offender travelled to Virginia Beach, [Virginia,] without the permission of his [p]robation [o]fficer and was arrested by the Virginia Beach [p]olice for driving without a license[;] resisting arrest or obstruct[ing] justice-threat or force[;] driving under the influence with child[;] and gross, wanton, or reckless care for child."  Specifically, the warrant provided that the Defendant violated Rule 1 of his probation by failing to obey the law; Rule 5 by failing to get permission from his probation officer to leave the State; Rule 8 by using intoxicants; Rule 10 by violating the special conditions of his probation, specifically, "no alcohol"; and Rule 14 by engaging in assaultive, abusive, threatening, or intimidating behavior, as well as in behavior that poses a threat to others.  Based upon the affidavit, the trial court issued a warrant for the Defendant's arrest, and the Defendant was taken into custody on September 6, 2022.

The trial court held a probation revocation hearing on February 15, 2023.  At the outset of the hearing, defense counsel noted that the violation of probation warrant was "based upon events out of Virginia which [the Defendant pleaded] guilty to, [pleaded] no contest to, was the understanding."  Defense counsel then said that the Defendant would "enter a technical plea of guilty to" violating his probation "because of the conviction in Virginia."  Upon questioning by the trial court, the Defendant pleaded guilty to the "July 1, 2022[ v]iolation [w]arrant[.]"  Defense counsel also stipulated that the trial court could "consider the facts in the warrant as the basis for the plea[.]"  The trial court then accepted the Defendant's plea and revoked the Defendant's probation.

The trial court stated that it would proceed with a hearing to determine the consequences of the Defendant's revocation of probation. The trial court next noted that it had received a February 14 report "showing that [the Defendant] was evaluated for the TN-ROCS Program."[3] The defense then called the Defendant's sister, Kayla Doxtater, to testify.

Ms. Doxtater stated that the Defendant had three children and was "a wonderful dad," who engaged in lots of activities with his children. According to Ms. Doxtater, the Defendant "started trying to do better for his life" after his third child was born and he was released from jail. Ms. Doxtater estimated that the Defendant's third child was about one-year old. She testified that the Defendant worked "every single day" to support his children and that he had considered seeking additional schooling. She also opined that the Defendant's receiving treatment for his alcohol problem "would really help him." Ms. Doxtater explained that when the Defendant drinks alcohol, he becomes "a whole different person" and that "every single time that he gets intoxicated, . . . he does have an issue."

The Defendant then testified. According to the Defendant, his third child was born in December 2021. He said that his children were his "number one priority," that he spent as much time as possible with them, and that he provided financial assistance for them. Regarding his employment, the Defendant stated that prior to his arrest, he was working "the best job" he had ever had, making twenty-five dollars an hour with a moving company. The Defendant's boss would pick him up for work, so he did not have to drive. He would be able to return to work if released into the community.

The Defendant said that he had an "occasional[]" drinking problem, explaining that it was "not as bad as it used to be" and that he now knew "when to stop." The Defendant indicated that he could comply with the conditions of any inpatient treatment program. The Defendant acknowledged that he had participated in previous programs, but he said that he did not want to participate in those prior programs "as bad as [he does] now."

---

[3] This report is not a part of the record on appeal. According to the State's website, the Tennessee Recovery Oriented Compliance Strategy ("TN-ROCS") Program "is a court diversion strategy that serves justice-involved adults who have mental illness, co-occurring disorders, or substance abuse disorders and who have low to medium risk factors for re-offending and medium to high needs for substance abuse and mental health services." Tennessee Department of Mental Health and Substance Abuse Services, *TN-Recovery Oriented Compliance Strategy*, https://www.tn.gov/behavioral-health/substance-abuse-services/criminal-justice-services/tn-rocs.html (last visited Nov. 27, 2023). The TN-ROCS model "provides an option for judges to address the needs of defendants who do not meet criteria for recovery court." *Id.*

The Defendant was then asked about the details of the June 25, 2022 incident in Virginia Beach that precipitated the filing of the violation warrant. The Defendant said that his boss was initially driving the vehicle, but because it was nighttime and his boss "only [had] vision in one eye[,]" he took over driving. The Defendant stated that he initially thought he was pleading no contest to the charges in Virginia, but when he entered the courtroom, his lawyer informed him that he could no longer plead no contest and that he would have to plead outright "to get out that day[.]" The Defendant indicated that he pleaded guilty that day in order to be released. According to the Defendant, none of his convictions for those offenses in Virginia were felonies, and he did not have any probationary sentence in Virginia after service of forty-eight hours for the DUI conviction.

On cross-examination, the Defendant was asked if he was "sanctioned by probation" for "picking up a misdemeanor offense" in 2019, though his probation officer did not seek a violation. The Defendant acknowledged that he was sanctioned in 2019 for a driving on a suspended license charge. In addition, he admitted that he was sanctioned by probation for failing a drug test in September 2021 by testing positive for buprenorphine and marijuana.

Regarding the Virginia Beach incident, the Defendant indicated that it was his boss's five-year-old child that was in the vehicle at the time of arrest. The Defendant said that while he was trying to find a parking spot, he attempted to avoid the headlights from the vehicle behind him by mistakenly turning down a one-way street before being pulled over by the police. According to the Defendant, the police did not have him perform any field sobriety tests or require him to submit to a blood test. The Defendant said that after being pulled over, he "started looking for [his] vape," and the officers "thought [he] must be trying to reach for a weapon." The Defendant denied that he was resisting arrest or that he was under the influence of anything, despite his having pleaded guilty to those offenses. The Defendant explained that he took his prescribed buprenorphine that day and was not using alcohol.

At the conclusion of the proof, the Defendant requested community release that included an "inpatient opportunity for professional treatment." Defense counsel noted that the Defendant had started "accepting responsibility" and that he was "a young man" with three children to raise. The State did not present any additional proof or make any argument.

In issuing its ruling, the trial court found that this was the Defendant's third probation violation and "each time he has picked up new charges[] while on probation."

The trial court stated that it was "looking at this third violation warrant."[4]  The trial court noted that despite the Defendant's denial of his guilt for the Virginia offenses, he, nonetheless, pleaded guilty to those offenses.  The trial court observed that the Defendant's third child was six months old in June 2022 at the time of the Virginia offenses and stated,

> So, I have to wonder if all this talk about him turning his life around and wanting to be there and straightening up because of this child, is because he wants to get out of jail.  Because for the first six months of her life, he sure hadn't straightened up and done the right thing.

The trial court further noted that the Defendant had left the jurisdiction without permission.  In addition, the trial court remarked that while the Defendant had a "pretty good job," he had not taken any initiative to seek treatment or change his ways, stating, "He's still out here drinking, ripping and running, committing a DUI with . . . a child in the car[.]"

The trial court said it had "considered the TN-ROCS Program" but did not think the Defendant was "ready for that" "at this time" as it was not "in his best interest."  The trial court also said that it "would consider Community Corrections" but that it did not "have that option available" because the Tennessee Department of Correction ("TDOC") "hasn't seen fit to provide a county, the size of Sullivan County, with a Community Corrections Program since 2019."  The trial court then commented, "We've tried straight probation, we've effectively tried split confinement because he's had to, on previous violations, he's had to serve some time in jail and then be placed back on probation and none of it has worked."  The trial court revoked the Defendant's effective ten-year sentence in full and ordered him to serve the remainder of his sentence in the TDOC.

The trial court entered an order to that effect, fulling revoking the Defendant's probation and giving him credit for time served.  The Defendant filed a timely, albeit premature, notice of appeal.  The case is now before us for our review.

## II.    ANALYSIS

On appeal, the Defendant argues that the trial court erred by ordering him to serve the remainder of his effective ten-year sentence in confinement.  Specifically, the Defendant contends that (1) the trial court failed to consider whether execution of the

---

[4] At the conclusion of the revocation hearing, the trial court stated that it was going to file a document with the clerk so that it would be a part of the technical record on appeal, presumably referring to this warrant.  However, the record on appeal does not include this warrant or any other prior probation violation warrants or revocation orders.

original sentence would serve the ends of justice and be in the best interests of the Defendant, his three children, or the public; and (2) the trial court reached an illogical conclusion when it said it "would consider Community Corrections" if that were still an option in Sullivan County, but at the same time, said that the Defendant was not "ready" for the TN-ROCS Program. The Defendant requests we reverse the revocation order and allow him to enter the TN-ROCS Program at a suitable inpatient treatment facility with intensive community-based supervision.

The State responds that the trial court made adequate findings for the record and did not abuse its discretion by ordering the Defendant to serve his original sentence as an appropriate consequence of revocation after finding that this was the Defendant's third violation of probation, that the Defendant had committed new crimes with a child in the car, and that the Defendant had previous opportunities for alternative relief that did not work. Relative to the trial court's statements regarding the TN-ROCS and Community Corrections Programs, the State contends that the trial court did not reach an illogical conclusion by refusing, after consideration, to place the Defendant in one program simply because another potentially more suitable program was unavailable.

Appellate courts review a trial court's revocation of probation decision for an abuse of discretion with a presumption of reasonableness "so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequences on the record." *State v. Dagnan*, 641 S.W.3d 751, 759 (Tenn. 2022). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). If a trial court fails to state its findings and reasoning for the revocation on the record, appellate courts may conduct a de novo review if the record is sufficiently developed, or the appellate court may remand the case for the trial court to make such findings. *Dagnan*, 641 S.W.3d at 759 (citing *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014)).

Probation revocation is a two-step consideration requiring trial courts to make two distinct determinations as to (1) whether to revoke probation and (2) what consequences will apply upon revocation. *Dagnan*, 641 S.W.3d at 757. No additional hearing is required for trial courts to determine the proper consequences for a revocation. *Id.* The trial court's findings do not need to be "particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Id.* at 759 (citing *State v. Bise*, 380 S.W.3d 682, 705-06 (Tenn. 2021)).

"The trial judge may enter judgment upon the question of the charges as the trial judge may deem right and proper under the evidence adduced before the trial judge." Tenn. Code Ann. § 40-35-311(d)(1). "If the trial judge finds by a preponderance of the evidence that the defendant has violated the conditions of probation and suspension of sentence, then the court may revoke the defendant's probation and suspension of sentence, in full or in part, pursuant to § 40-35-310." *Id.* Notwithstanding subdivision (d)(1), the probation statute provides for two categories of probation violations, technical and non-technical, with differing penalties for both. *State v. Walden*, No. M2022-00255-CCA-R3-CD, 2022 WL 17730431, at *3 (Tenn. Crim. App. Dec. 16, 2022).

The following are classified as non-technical violations: a defendant's commission of a new felony or a new Class A misdemeanor, a zero tolerance violation as defined by the department of correction community supervision matrix, absconding, or contacting the defendant's victim in violation of a condition of probation. Tenn. Code Ann. § 40-35-311(e)(2). Once a trial court determines that a defendant has committed a non-technical violation of probation, the trial court may: (1) order confinement for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period not exceeding one year; (4) return the defendant to probation on appropriate modified conditions; or (5) resentence the defendant for the remainder of the unexpired term to a sentence of probation. *See id.* §§ 40-35-308(c); -310; -311(e)(2).

Here, the trial court's application of the first step of *Dagnan* is not in dispute. At the revocation hearing, the Defendant pleaded guilty after questioning by the trial court to the allegations contained in the July 1, 2022 probation violation warrant as they pertained to the Defendant's behavior in Virginia on June 25, 2022. Defense counsel also stipulated that the trial court could "consider the facts in the warrant as the basis for the plea[.]" The Defendant admitted at the revocation hearing that he had pleaded guilty outright to the offenses in Virginia. Although the Defendant denied his underlying guilt for those offenses and claimed he initially thought he was entering a no contest plea, the Defendant's stipulation to the allegations contained in the probation violation warrant alone supports revocation. *See State v. Brewster*, No. E2021-00793-CCA-R3-CD, 2022 WL 2665951, at *4 (Tenn. Crim. App. July 11, 2022) (citing cases), *no perm. app. filed*.

Turning our attention to the trial court's reasoning for ordering incarceration as a consequence of revocation, the second step of *Dagnan*, the Defendant argues that the trial court failed to consider whether execution of the original sentence would serve the ends of justice and be in the best interests of the Defendant, his three children, or the public. In issuing its ruling, the trial court noted that this was the Defendant's third violation of

probation warrant[5] and that the Defendant continued to "pick up new charges[] while on probation." The Defendant first violated his six-year sentence by picking up numerous new charges that resulted in his April 8, 2021 guilty plea and an extension of his suspended sentence by an additional four years. At the revocation hearing, the Defendant also admitted that he was sanctioned in 2019 for a driving on a suspended license charge and in September 2021 for failing a drug test. The trial court commented that despite the Defendant's claims of turning his life around and wanting to be a good father and provider, the Defendant's third child was six months old at the time of the Virginia offenses, which involved the presence of a five-year-old child in the vehicle. The trial court observed that the Defendant left the state without the permission of his probation officer. In addition, the trial court remarked that though the Defendant had a "pretty good job," he had not taken any initiative to seek treatment or change his ways, stating, "He's still out here drinking, ripping and running, committing a DUI with . . . a child in the car[.]" The trial court further specifically stated that placement in the TN-ROCS Program would not be in the Defendant's best interest.

As noted above, the trial court's findings do not need to be "particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Dagnan*, 641 S.W.3d. at 759 (citing *Bise*, 380 S.W.3d at 705-06). To impose the Defendant's proposed standards would go beyond the requirements of *Dagnan* and necessitate a trial court include specific phraseology in its ruling, which we will not do. The record in the present case reflects that the trial court appropriately analyzed the evidence and made findings regarding the facts and circumstances as they informed its decision regarding the appropriate consequence for the violation.

Moreover, a trial court may, in determining the appropriate consequence for a probation violation, consider "the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character." *Dagnan*, 641 S.W.3d. at 759 n.5. In rendering its decision to revoke the Defendant's probation in full, the trial court considered the Defendant's past criminal history, including his multiple violations of his past probationary sentences, and noted that the Defendant's previous opportunities for alternative relief did not work. These facts indicate that measures less restrictive than confinement were unsuccessful for the Defendant and reflect poorly on the Defendant's potential for rehabilitation. *See* Tenn. Code Ann. § 40-35-103(1)(C) and (5).

---

[5] Though the violation warrant was not made a part of the record as the trial court indicated it would be, it is the Defendant's responsibility to make sure there is an adequate record on appeal. *See* Tenn. R. App. P. 24(b).

The Defendant also argues that the trial court reached an illogical conclusion when it said it "would consider Community Corrections" if that were still an option in Sullivan County but that the Defendant was not "ready" for the TN-ROCS Program. According to the Defendant, given these statements by the trial court, there was no logical reason why the trial court refused to send the Defendant to the available option of TN-ROCS. First, we note that the February 14 TN-ROCS Program report is not a part of the record on appeal. It is an appellant's responsibility to provide a full and fair record of what transpired in the trial court, including the components relied upon by the trial court in determining the sentence; this burden clearly rests upon the appellant. *See* Tenn. R. App. P. 24(b). Moreover, the trial court merely mentioned that it would consider placement in the Community Corrections Program if such were available. And we agree with the State that the Defendant is not entitled to placement in one program, which the trial court considered and found the Defendant unsuitable, simply because another potentially more appropriate program was unavailable.

Finally, we observe that though the Defendant requests placement in TN-ROCS Program to receive inpatient treatment for substance abuse, the Defendant denied having a significant drinking problem at the revocation hearing, describing any problem as occasional, and saying that it was "not as bad as it used to be" and that he now knew "when to stop." The Defendant also acknowledged that he had participated in previous programs and that he failed a drug test in September 2021 for buprenorphine and marijuana. Despite the purported occasional nature of this problem, the Defendant said that he did not want to participate in those prior programs "as bad as [he does] now." The record shows that either the Defendant's substance abuse problem is not as serious as his record suggests or he is downplaying the seriousness of his problem. Either conclusion supports the trial court's determination regarding the Defendant's unsuitability for placement in the TN-ROCS Program.

Due to the non-technical nature of the violation given the Defendant's commission of new Class A misdemeanor offenses in Virginia, the trial court was statutorily authorized to order the Defendant to serve the remainder of his sentence in incarceration. *See* Tenn. Code Ann. § 40-35-311(e)(2). Accordingly, the trial court acted within its discretion when it ruled that the Defendant was no longer a good candidate for probation and should serve the remainder of his effective ten-year sentence in the TDOC.

### III. CONCLUSION

Accordingly, the Defendant is not entitled to relief, and the judgment of the trial court is affirmed.


_____
KYLE A. HIXSON, JUDGE